Good morning. Will counsel on the first case please approach? And would you identify yourselves and tell us who you represent, please? Mary Mhafizee of Kaiser Law for the plaintiff's appellant. I'm sorry, I didn't get... Yeah, especially me, especially me. These are not amplifying microphones, they're just recording microphones, so you need to keep your voice up. Okay. Mary Mhafizee of Kaiser Law for the plaintiff's appellant of Enbar. Thank you. Michael Kujawa on behalf of the defendants, District 211 and Laurel Cunningham. And I apologize for being late and for being out of breath, I just sprinted over here. We'll hold it against you. Now, we are liberal about time requirements, but how much time would you like? I would say ten minutes for the initial part and then I'll reserve whatever is left for the rebuttal. Okay, Mr. Kujawa? I think I can be done in ten minutes. Okay. All right. Thank you. Good morning, Your Honors, if it may please the Court. This case was appealed because the trial judge under-directed verdict on the willful and wanton conduct issue. And we're appealing that on the procedural issues. The defendants are bringing up issues of 2201 discretionary immunity and 3108 immunity with the exception of willful and wanton conduct. So I'll let them argue the immunity stuff and I'll respond to that and I'll focus on the procedural errors with the directed verdict with this argument, if that's all right with Your Honors. A little bit of background. The game rules for deciding a motion for a directed verdict, the standard is this. A directed verdict should be entered only in those cases in which all of the evidence when viewed in its light most favorable to the non-moving party. What case are you getting that from? Pedrick v. Peoria, Illinois Supreme Court, 1967. But there's, you know, the Pedrick standard is quoted all the time. I mean, all the time. I mean, when I was a lawyer, I was dealing with that, you know, regularly. And people cite the sentence that you cite there. And that's the Pedrick standard. But Pedrick also says that the right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance. So I know that you're saying that, you know. That's too shocking. This is only a test as well. So the test that I'm asking you to pass here is to identify for us today, as I'm sure you attempted to do in front of Judge Shelley, the factual disputes of some substance that she ignored by directing the verdict in favor of the defendant. Well, the analysis that she went into when she was deciding the directed verdict, she was analyzing whether the evidence was good enough or whether it rose to the level of willful and wanton conduct. And she didn't feel, apparently, that the not providing the glasses or the goggles that were available in the floor hockey equipment was sufficient. And that wasn't her role to take. She can't analyze the evidence. She can't weigh the credibility. Isn't that the same as her saying, if she had said, if the trial judge had said, I don't think these allegations give us any facts with any substance of willful and wanton conduct. Isn't the trial judge allowed to do that under Petrick? I don't think so, especially in this situation. The whole case from the beginning was about the failure to use the safety goggles that were there. And that was the crux of the case. That was the basis for the willful and wanton conduct. So in order to prove our burden, we had to have evidence that there were goggles available, that she could have chosen to make the kids use them, and she didn't. And that she knew that there was a risk of not using them. And we had the evidence to support that. So we met our legal burden. Whether that rose to the level of willful and wanton conduct, that's the question of fact for the jury to decide. But the position you're taking in your reply brief is that teachers have to use all, take all precautions for their students' safety. And how do you reconcile that with Lynch and Polker, which say if a school district and its teachers or athletic personnel take some precautions and they don't do everything that they possibly could to prevent injury, it's not willful and wanton? I don't think that we're seeking that all precautions have to be taken. But all known precautions should be taken. For example, in a chem lab, if the chemistry teacher has the safety goggles available, when they're doing experiments that could explode, and it may never have exploded for that teacher, and it may have never exploded in that school district before, but the known risk is there, you have that safety equipment available. There's absolutely no reason why the teachers shouldn't be required to use it. And to consciously disregard that risk, something that they could easily prevent by using the available goggles, that's willful and wanton. And that just, I'm sorry. Go ahead. Finish your thought. The extension of that is that we protect the kids and we protect the people that are there. So, again, what is the distinction, then, between negligence, that is not taking every possible precaution, and willful and wanton? What distinction is there? I think that with negligence, it's, negligence would be if she didn't choose to have some of the safety rules that she put in place, like the no high-sticking rule. That's a precaution. She has to take all precautions, according to you. But those are things that she's just sort of, you know, thinking about. And it's not black and white. It's not concrete. It's not something she can pick up and give to the kids. See, in this case, if, you know, one of the teachers says... But if she said, hey, do anything you want. High-sticking, checking, this is hockey. That sounds like willful and wanton to me. Right. Absolutely. But you're saying if she didn't do that, that would be okay. I think that the key difference here is that the school district, at some point, purchased these goggles for purposes of floor hockey to prevent eye injury. She had it there with the hockey equipment, just like they bought the plastic sticks as opposed to the wooden sticks. And one of the teachers testified that they had old hockey balls that were more dangerous, apparently, than these safety balls, and that the teachers were not allowed to use those old balls if they happened to come across one. And so that, to me, would be willful and wanton conduct as well, because you have the correct equipment there, you know what the risk is, and you're not using them. And I think that's the key distinction. And so, again, I go back to Lynch, the Powder Puff football game, where the plaintiff had an expert at trial saying that IHSA regulations require the use of protective equipment. No helmets, no pads, no equipment. And the Supreme Court said, as a matter of law, not willful and wanton. I think the distinction for Lynch is that, first of all, it was an extracurricular activity. And the coach had told them, I recommend that you guys get, you know, mouth braces, I recommend that you get some of this equipment. But their ability to participate wasn't incumbent on the kids and parents following their instructions. It was just a recommendation. And in gym class, there's no choice. The kids have to go to gym class, they have to participate in the activities, and they have to follow the teacher's instructions. And there's not a kid in this world that's going to go get safety goggles on his own if the other kids in the class aren't using them. And so it's on the teacher to say, okay, my 12 kids who are playing floor hockey, go get the goggles. And they'll all play and they'll all do their thing. And that's the difference between Lynch and here, is the voluntary difference. It seems to me that what you have is you have some evidence. Okay? You have some evidence. And the whole background of Pedrick is that they were getting rid of the some evidence standard. They were getting rid of the mere scintilla argument. They were getting rid of the any evidence argument by saying, if there's some evidence, that doesn't necessarily mean that it's enough to make the judge allow it or tell the judge that the case has to go to the jury. So I just don't know that ‑‑ I think the judge was telling you that you had some, but you didn't have enough. Again, I don't think that's really the standard in Pedrick. I think it's all evidence. And in Guelpher, they stated it differently. A defendant is not entitled to a directed verdict unless the evidence totally failed to establish one or more necessary elements of the plaintiff's case. You know, I know that that is in that York case. That quote is in the York case. But I don't think that's an accurate reflection of what Pedrick is. And you're here stating the obvious fact that Pedrick is still good law. Pedrick says, quote, but the presence of, small quote, some evidence of a fact which, when viewed alone, may seem substantial, does not always, when viewed in the context of all the evidence, retain such significance. And they go on to some lofty quote or anecdote or analogy. And I think that's the circumstance that you're in here. There was some evidence because there were goggles and the teacher opted not to insist on the goggles. But in light of everything else that was done, the trial judge is allowed, despite what you say, I think the trial judge is allowed to a certain extent to weigh what is in front of the court and decide whether or not it should go to the jury. Actually, that's in conflict, though, with the way that a directed verdict is supposed to be decided because the trial judge is not allowed to resolve the conflicts in evidence or weigh the credibility or assign weight to the evidence. I think what Justice Laven is saying is that the determination is whether the evidence, viewed as a whole, raises this substantial issue. So I think what it boils down to is this. If the judge didn't feel, it sort of boils down to, I didn't like the case. I don't think that this rises to that level. But it was litigated for years. It went through motions to dismiss. It went through motions for summary judgment. It went through an entire trial. And it really wasn't the trial judge's place to take that decision away, especially on the issue of Wolf and Watton conduct. Because we met, there was never a, it was never, from the beginning it was about the goggles. And so we met our burden of proof on the goggles. And so just because that's not sufficient to her to be Wolf and Watton conduct, that's not, that wasn't her role. Her role was did we meet our burden of proof. I look at it a little bit differently, though, that, you know, the judges along the way that may have ruled on the different motions that came up and the motions in Lemonet and whatever, you know, you were allowed to put the entire case on in front of the jury. And then at the end the judge was in a situation where she had to, you know, rule on a motion for directed verdict. And in reading, you know, the record here, it seems that she did not find that there was enough evidence of Wolf and Watton, even though there was some evidence that there was something that maybe could have been done, maybe should have been done, that could have prevented the injury. I think that's what she was doing in granting the motion. I don't know. That's just the way it seems to me. And that's where I feel like that was the problem is that wasn't her place to do it. We had to meet the burden to meet our issues instruction. What we produced was these are the issues of Wolf and Watton conduct. And we needed to have the evidence, the testimony, to prove that, and we did. And that was – If you had evidence of another child who had been injured in the same way, had an eye injury, even though there were goggles, and then this happened to this child, that would be something different. That would have some substance that the other – that the allegation that you wanted to go to the jury simply didn't have. I mean, what you had is a case of carelessness, perhaps. But if it was carelessness plus notice that this had happened before, you know, that might be something that a trial judge should not take from the jury. But then you're going towards sort of like that one-bite rule, like something bad has to happen first in order for someone else to recover for an injury. And the foreseeability is there. She testified that the balls go up, the sticks go up, it's a fast-paced game. She testified that – and the fact that the school district had purchased the goggles for floor hockey is indicative of the fact that they found that there was an inherent risk to the eyes during that game. So the foreseeability is certainly there. Maybe not the dilation, the permanent dilation or whatever, but the eye injury is certainly possible. And she testified that the balls hit the face. There's no question that these goggles were purchased for hockey. Correct. And there is no question that she just chose not to even count them. Right. And there is no question that she did not require them. Correct. There's also no question that she allowed the students to fool around with them and make fun of them. Apparently. And she didn't stop that. No. And she knew that the students were playing around with them and making fun of them. Yes. But I think it's important here to know that that wasn't when Evan Barr was in her class. I'm sorry? That was not when Evan Barr was in her class. Okay. But she knew other students played around and fooled around with them. And there's no question that we all know 15-year-olds are not going to be anxious to be made fun of. In fact, Evan Barr testified that he didn't want to be made fun of. Absolutely. Thank you. All right. Any further questions? Okay. Okay. Thank you. Thank you. Good morning, Your Honor. The standard that Plaintiff's Counsel is promoting here regarding a motion for a directive verdict is really well beyond what the law requires. And it really takes the decision, any possibility of granting a directive verdict in a case like this, out of the trial judge's hands. And that's just not what the law is. Judge Shelley did get it right in this case. Because while there certainly was evidence that there were goggles present at Conant High School on the day of the incident, and that everyone knew that there were goggles present, there was absolutely no evidence. The evidence was undisputed that there were no prior injuries, really of any kind, involving floor hockey, but certainly no significant eye injuries, nothing like what happened here in this case. And that's really what was missing when the analysis on the motion for directive verdict was done by Judge Shelley, regarding what does this rise to the level of Wilflin-Wanton conduct? Can a verdict? Well, what about to the point, for example, of the chemistry lab, where everybody's provided goggles and maybe nobody's been injured before, but the reason the goggles are purchased is precisely to prevent eye injuries. And the teacher, because the kids really don't want to wear them, they look goofy, doesn't make them. I mean, these goggles were purchased for floor hockey. And there is a statute in Illinois which mandates goggle use in laboratories, chemistry laboratories and schools in Illinois. So that would be a completely different scenario. There is no mandate of law, and this gets into our discretionary immunity argument, but there is no mandate of law, there's no IHSA rule, there's no rule at all, anywhere, that says you must use these types of goggles when you're playing floor hockey, in particular with the equipment that was being used. When you look at the various decisions that Laurel Cunningham made when she was teaching her class, she knew that she was going to limit the amount of players that were going to be in the, because of spatial issues. She knew that players who were going to not maybe be in the game at the time were not going to be allowed to sit on the floor, they had to be standing somewhere else. She had the high-sticking rule, she had the no-bending-the-stick rule. The safety ball, I brought it here, but the ball that they use, this is not any sort of, this is much softer than even a racquetball. And so when you talk about the accommodations or changes that were made from regular hockey to floor hockey, what Ms. Cunningham did was she balanced competing interests here, and she evaluated how much space do I have, how many kids do I have in the class. What though argued against the provision or the use of the goggles that were provided? Anything that argued against it in terms of, well, yeah, I could have the kids wear goggles, but I don't really think we need them. As counsel pointed out, there is no kid who is going to voluntarily wear these goggles. And what they were doing here, this was what was called a heart rate day. And so they had, the 45 students in the gym class had options available to them. Some of them, I mean at least in my perspective, my viewpoint, are not so appealing, like running stairs or running laps or doing calisthenics in the corner of the gymnasium so that your heart rate maintains a certain level. But these kids, and it was generally the same 8 to 10 kids or 12 kids who would play every time, and they've done it 8 or 10 times before, they like to play floor hockey. And that was a, she wanted those kids to have that option. And so, again, she's got 45 kids. If she can have a dozen kids who will play floor hockey who maybe would say, I am not putting on those stinky old goggles that have been sitting around forever that make me look foolish. I'm not going to play floor hockey then. I'll go run the stairs if that's what I have to do. But she's trying to manage 45 kids in her class, and that's where she's balancing competing interests in terms of resources, manpower, equipment, time, and promoting new activities and activities that the kids like as opposed to everybody coming in there and grumbling through a full class session of running stairs because it's heart rate day. These kids wanted to play floor hockey. And so when we look at the balancing of competing interests, and I think Judge Shelley got this absolutely right on the willful and wanton conduct case. I think this falls right under the Lynch case where they talked about, look, the IHSA says you're supposed to have that protective equipment, and you didn't provide it, but this is not willful and wanton conduct. What we have here is maybe insufficient precautions for protection. Same thing in the Belima case, Belima versus River Bend School District, with the Gatorade spill in the gym where they had the coach stand here while I go get something to clean up the spill. And the coach is talking to somebody, and somebody comes up to talk to him and slips him the Gatorade before he can stop him. And there they said, mere ineffectiveness does not show a course of action demonstrating utter indifference or conscious disregard. And the course of action language is what's really important here because, as Justice Staben pointed out, there's no prior injury here. And so unless you, certainly the ball, it's floor hockey, the ball is going to fly around, it's going to do things, but she had a rule that said you don't try to elevate the ball. That was one of the rules as well. That's why she wouldn't allow the bending of the sticks. The ball is supposed to stay on the ground. Now, we know it's kids playing floor hockey. Is the ball going to come up at times? It might, but no one had ever even been hit in the face with the ball before, let alone hit in the eye or suffered an eye injury. And when you look at the ball and you look at the level of play and how the rules were enforced during the game, you can come up with a million scenarios for foreseeable injuries when kids or anybody is involved in physical activity. I certainly could have twisted an ankle or something in my sprint over here today, and maybe that's foreseeable, but it doesn't necessarily turn it into a course of action which rises to the level of willful and wanton conduct. So every teacher, every school, every school board, every physical education department head has to wait until there's been an injury to say, okay, we're not going to let that happen again? I don't think that that's what the standard is. I think when we talk about willful and wanton conduct, though, and when you talk about what the evidence must be. That's why it's not just utter indifference or conscious disregard in the definition of willful and wanton conduct. It is a course of action. Okay, so your teacher knew that it was possible for the ball to fly up and hit somebody in the face. She said that. She said that. Well, yes, she knew that the ball could fly up to eye level, I think is what she said. And these are a bunch of kids. I was curious about one thing in your brief. You said the plaintiff, Evan Barr, knew there was a danger. What difference does it make? He's 15. So what? We've got a teacher who's an adult in the room. So isn't the responsibility hers always to figure out, you know, if there's a possibility of danger, and we have these goggles here that somebody, I don't know who, but somebody bought them, and they're for floor hockey because they're not with the softball equipment and they're not with the basketball equipment. They're with the floor hockey equipment. So since I know that the ball can bounce up and hit someone in the face, the eyes are in the face, and I know that these are kids and they're not always going to be really careful, and I know I've got 30 other kids I've got to be keeping track of and I can't watch them every single second. Uh-oh, and I know kids will never voluntarily wear these goggles because they look goofy. I'm going to just decide I don't need to make them wear them. And I think reasonable people might say that they would disagree with Laurel Cunningham's decision and that if they were in her shoes, they would have done it differently. But that's the reasonableness standard under the definition of negligence. I do not think that is the standard for willful and wanton conduct as defined in Section 1210 of the Tort Immunity Act when we talk about a course of action. Well, she knew the goggles were there. She made a conscious decision not to require them. Yes, she said I do not believe that they should be required or mandated equipment for floor hockey. But I don't believe that that equates with a conscious disregard for the safety of others. Well, she made a conscious decision to let other kids in other classes goof around with them and make them look even sillier than they were. There was some testimony about kids mocking the goggles, putting them on and laughing about them. But again, I don't see how that raises to the level of the failure to say everyone who plays floor hockey will wear goggles rises to the level of conscious disregard for the safety of others. Laurel Cunningham's conduct, and you have to look at it in context with everything else that she did, was the antithesis of willful and wanton conduct. She stressed safety in every aspect of the game, from the way they would handle the equipment to the type of equipment that would be used to the rules that she would apply, whether to whistle them for high sticking, sit them down, all of those things. And that's exactly what Judge Shelley focused on. Otherwise, what you take is instead of, now you've changed the standard from willful and wanton and turned it into some sort of strict liability standard. Well, because the next thing is, well, somebody could get hit in the teeth with a stick because maybe a kid high sticks, even though the rules say you're not to. And is it foreseeable that a child might raise the stick above their waist and get up to where a kid could get hit in the mouth? It sure is. Well, where are the mouth guards? And then it's, well, where are the helmets? And what if the kid, you know, the testimony of the case was, when they looked at sports that they had these kids participate in, floor hockey was not one that they were very concerned about. They had much more problems with basketball or softball, with kids hurting their fingers trying to catch the ball, catching an elbow during a basketball game. Those are all things that can happen. There is an inherent risk of injury in any physical activity, and especially in any physical education activity. And so I understand what you're saying, Your Honor, but I think that to put that burden on them and to say, well, that's a foreseeable injury and you didn't do anything about it, therefore we're going to say it's Wolf and Watt and Conner. What I'm trying to figure out is how it's okay for her to shift the burden for deciding on some safety measure to 15-year-olds instead of when she knows, everybody who's ever had a 15-year-old knows they're not going to volunteer to wear goggles because they're goofy looking. So instead of taking a step herself, she says, I'll just let the kids decide. Well, what did she think was going to happen? She did not think that anyone was going to suffer an eye injury. Well, did she think any kid was going to volunteer to wear those goggles? I don't know that she thought whether, what she did was make them available. If the kids wanted to wear them, if for whatever reason they felt that it was necessary for playing floor hockey, I think everybody else who testified said I didn't think they were necessary for playing floor hockey. So we'll leave it up to 15-year-olds to decide. Well, I think we leave a lot of things up to 15-year-olds, especially if these 15-year-olds got to choose whether they wanted to play floor hockey at all. There are plenty of kids in the class who decided they'd rather run stairs or do calisthenics or run laps. So, yeah, he's 15, but he's 15. They can make decisions. If a kid has a bad knee and he's going to go to gym class and play basketball, he should be able to know whether or not his knee can do that or not or whether he needs to wear a knee brace or not. He shouldn't need a gym teacher to have to tell every minor, every one of 45 kids, to let them know what every single kid's particular level of ability is or knowledge regarding whether they feel they're safe or not. He has free will. Well, he could have chosen to use the goggles, and he knew they were there. He knew they were there for the ten times he played prior to this, and he never felt they were necessary either. So, again, I think that you could say, well, I would have decided differently if I had been in Laurel Cunningham's shoes. I would have mandated the use of those goggles. But maybe that would be negligence if that's how someone feels. But it's certainly not willful and wanton conduct, not with the evidence in this case. And there's all sorts of case law which talks about the fact that you may not, a teacher, the Toler versus District 202 case, which we cited in our brief, is a good example with the wrestling class. So the instructor knows he messed up and put two kids together who were in different weight classes, if you will. And that's one of the rules of regular wrestling, but he did it in the gym class. But he also took all these other precautions. And what the court said there was, this is the antithesis of willful and wanton conduct. You don't have to provide every single piece of safety equipment that may be available for every single activity. If you had to do that, then school districts would never be able to conduct any activities. This isn't a question of whether or not the school board decided to pay for this equipment and they made a decision not to buy shin guards or not to buy mouth guards or not to buy softball helmets. They made a decision to buy these goggles. The goggles were there. Someone made that decision. And I think that's where we get into the discretionary immunity of Laurel Cunningham, who had the ability to, and there were no directives given to her on how she was to teach her class. She formulated and planned her class and decided that floor hockey was going to be one of the activities that she would make available to kids who wanted to play it during these heart rate days. And so we know from the Corson case that 2201 discretionary immunity applies to school districts and teachers. They went through a long analysis in that case about should this apply to teachers in the classroom setting. And they said, yes, it does. And it makes sense when you think about the level of autonomy and the level of supervision that is provided by teachers in their classroom. And clearly she exercised discretion in deciding whether to mandate the use of these goggles or not. It's not a ministerial act because there's no mandate of law, like there would be in a science classroom or a chemistry lab that mandates the use of safety goggles. And she made a policy determination in the balancing of competing interests. She's got 45 kids. She wants to keep those kids active and interested and engaged in the physical education curriculum. And the way to do that is to provide them some activities. And for these 12 kids who like to play floor hockey 8 to 10 times prior to this date, that did engage them. That made her a better teacher and that a better class. And she balanced the competing interests regarding resources, time, space, and trying to teach the class to the best of her ability and give those kids the best education she could. What you're saying is that this was all a conscious process in exercising discretion. So consciously she knew that there were goggles available. She knew the kids didn't really like to wear them. And she consciously disregarded whatever safety the goggles could have provided the children. I think that's what your colleague is suggesting, is enough evidence of lawful and lawful conduct that maybe the judge should have allowed the jury to say yes or no. Well, certainly there was a conscious decision made by Ms. Cunningham. She testified very clearly about that. She knew the goggles were there. She did not think they were necessary in this case because of every other thing, every other safety precaution that she had put into place. And with the idea that if you mandate these goggles, maybe no one's going to play floor hockey and it's going to make the heart rate day maybe a less appealing day for these kids than it would be otherwise, she made a decision, and a conscious decision, to say I'm not going to mandate. I'm going to enforce these other rules, but I'm not going to mandate this particular thing. And so I think, yes, conscious decision, policy determination, all of those things apply when we're talking about discretionary immunity. But what it doesn't do is rise to the level of a course of action which shows a conscious disregard for the safety. She wasn't consciously disregarding safety. She was paying attention to safety. In the context of what we're talking about here, floor hockey, this ball, the goggles, et cetera, what type of action do you think she would have had to have done in order to rise to the level of lawful and lawful? What would the jury ought to have decided as opposed to the judge directing the verdict? I think that if there had been prior eye injuries to players playing floor hockey, one other injury even, and I would argue against that, of course, but if you had another documented eye injury, that you said, well, you know, we know last year Joe Smith went to the hospital with an eye injury because the safety ball popped up and hit him in the eye and, you know, despite everything we thought before, that the ball was too soft, that the sticks weren't, you know, both of them bent, and all the rules we put in place, a kid still got hurt. Now, then I think maybe you'd have a case where Judge Shelley would say, you know what, there's a prior injury here and you had knowledge of it, and so I think maybe that is enough to get to that course of action language, not just indifference or disregard. And you've got to remember, again, we're talking utter indifference and conscious disregard for safety. Or, not in. Or, or, one or the other. But the definition doesn't just say disregard or it doesn't just say indifference. It says conscious disregard, and I guess the debate here is whether or not there's enough evidence of a conscious disregard when a teacher decides, yeah, I know they have goggles, these kids don't like to wear them, and I'm not going to insist upon it. Is that something that, you know, she has an inner consciousness and then she disregards it. The goggles are there, the kids are playing, something might happen, but it probably won't. Is that enough? What we're being asked to decide here is, is that enough that a jury ought to decide it as opposed to a trial judge? No, it is not enough. It's not even close to enough. And without any knowledge of prior injuries that would rise to give you that course of action, I think the Ohio Supreme Court has said it's not enough. Can you cite us a case where, and I happen to agree with what you're saying, if there was a prior injury, a prior eye injury, that that is something that might go to a jury. Can you cite us a case that makes that distinction? The one injury, taking it out of the motion for directed verdict? Right. Well, I don't know about directed verdict necessarily, but that in order for it to rise to the level of willful and wanton conduct, there has to at least have been one other instance of injury. I don't know that it's ever been phrased like that. I think what they talk about is the fact that you did what you could. When we're talking about willful and wanton conduct, utter indifference or conscious disregard, if we look at the Baluma case with the Gatorade spill. Say, hypothetically, somebody went over to the box that day, picked up a pair of goggles and started to put them on, and Ms. Cunningham said, you don't need those. And it wasn't that kid that was injured, but it was Evan Barr. Is that enough? If she, again, without an injury prior to that, I think. Would you take the chance and ask him for a directed verdict in a case like that? That's an unfair question. I'll always ask for a directed verdict. I think that if she had, for whatever reason, stopped a kid who said, I want to wear the goggles, and she said, no, I'm not going to allow you to wear the goggles or something like that. Not that I'm not going to allow you, but, yeah, you don't need to put those on. Well, I think that message was given to the kids already because they weren't mandated. The kids knew that there were goggles there. They might mess around with them, but nobody ever wore them. But, again, I don't think that her saying, all she would be saying then would be verbalizing what she thought already, which was they are unnecessary. I have evaluated this. I've evaluated the activity that the kids are going to be playing in. I've evaluated the ability and skill level and the intensity of the activity that they're going to be engaged in. I've evaluated the equipment. I've evaluated the space. I've evaluated everything here. And knowing all those things, I don't think those goggles are certainly, if you want to wear them, go right ahead. But I'm not going to mandate you wear them at the risk of nobody ever playing floor hockey again. We need to give your opposing counsel a little rebuttal time, and we have another case this morning. Thank you. Thanks, counsel. Thank you. There's just a couple of points I want to address. First, the Hadley case, the industrial arts case, is a really good one to analogize to our case. In that case, the teacher had told the kids about the table saw, and he had told them about the metal that could pop up. He told them about these different things that could happen. The kid did not listen to him, and he had mandated the goggles, and the kid got hurt. And so that was found to be willful and wanton conduct. And it didn't matter that he had done some of those other things, because on that day, in that time, he didn't. And so it doesn't make sense. That was awareness of a specific risk. I mean, obviously, using the table saw on metal carries with it the risk that shards are going to fly. Is that analogous to what we're talking about here, floor hockey with modified equipment and safety rules? I think so, because the equipment in industrial arts is also modified. The equipment has the safety pieces that are a part of it and everything like that. They had the goggles that were available. And you don't always necessarily use goggles in industrial arts, like if you're using a hammer, but you do for certain other things, just like with floor hockey, you use goggles, but maybe not in basketball. And so I think there was no prior injury that had happened in order for the teacher to be held responsible for willful and wanton conduct. Another point I wanted to make was with Toler. In that case, the teacher had done all the safety rules that he could for wrestling. And the cause of the injury was because one of the kids made an illegal move and, like, threw the kid down and injured him. And that was against the rules. In this case, both of the kids who were playing hockey, when the ball popped up, they were both playing right. They weren't high-sticking. They weren't breaking any of the rules. They went for the ball, and it popped up and hit him in the eye. And so everybody, abiding by her safety rules, still got hit in the eye. And that injury would have been prevented with the use of the goggles. And that's why it's willful and wanton conduct, because that directly could have been prevented. And, you know, Mr. Kujawa made the reference to, in softball, we can't prevent this. You can get elbowed in basketball and all these things. Absolutely. But getting elbowed in floor hockey, we wouldn't be here. He got hurt in the eye, and there was equipment there to prevent that direct injury. In softball, if they don't have the shin guards available, then they're not going to be held responsible for a cleat in the shin, or if they're playing soccer. We're not asking the school board to go above and beyond what they've already done. The school board took the money that they have, and they allotted some money for goggles for floor hockey. That's a big deal for a school district to allot money for things. And she didn't use that safety equipment that was available, and it would have prevented this injury. And then with respect to, he made the point that reasonable people might disagree. You know, maybe you would have done differently. Maybe we would have chosen to use the goggles. That's what makes it a question of fact for the jury. Did that rise to the level of willful and wanton conduct? Was that a conscious disregard for the safety, knowing all these facts that are involved? It's such a highly factual question, and it wasn't Judge Shelley's role to resolve those conflicts in evidence and to weigh the credibility or give weight to the different pieces of evidence. We had the evidence there to support our burden, and therefore it should have gone to the jury on the question of fact. Anything else? Thank you very much. We will take the case under advisement. Again, I want to thank counsel for all parties for excellent briefs, excellent presentation this morning, very interesting case.